# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| THE CJS SOLUTIONS GROUP, LLC <br> d/b/a THE HCI GROUP, <br> *Plaintiff* <br><br> v. <br><br> MARY CLOWERS AND COWBOY & <br> SCHATZ, LLC, <br> *Defendants* | §§§§§§§§§§ Case No. 1:21-CV-223-RP |

## ORDER

Before the Court are Defendants' Opposed Motion to Exclude Plaintiff's Expert Under Fed. R. Civ. P. 702 (Dkt. 71), filed May 16, 2022; Plaintiff's Response, filed May 31, 2022 (Dkt. 72); and Defendants' Reply (Dkt. 75), filed June 14, 2022. By Text Order entered May 19, 2022, the District Court referred the Motion to Exclude and related filings to the undersigned Magistrate Judge for disposition, pursuant to 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

### I. Background

Plaintiff The CJS Solutions Group, LLC d/b/a The HCI Group ("HCI") is a Florida company with its principal place of business in Jacksonville, Florida. HCI offers IT consulting and professional services to healthcare facilities in the United States. Plaintiff's Am. Compl. (Dkt. 38) ¶ 16. As part of its services, HCI provides staffing to healthcare facilities to implement new electronic medical record systems ("EMR"). HCI has a business partnership with EPIC Corporation, a healthcare software company offering an electronic medical record software called "EPIC EMR." *Id.* ¶ 17. EPIC EMR supports functions related to patient care, clinical systems for medical professionals, systems for imaging and lab reports, and record keeping and billing systems

for insurers. As part of its partnership with EPIC, HCI enters into service agreements with healthcare facilities to provide EPIC-certified consultants to assist in implementing EPIC EMR. *Id.* ¶ 18.

In February 2019, HCI entered into a service agreement with Seattle Children's Hospital (the "Seattle Project"). *Id.* ¶ 23. On February 3, 2019, HCI sent Mary Clowers, a Texas resident and the President of Cowboy and Schatz LLC ("C&S"), a letter offering her a consulting job as Program Director for the Seattle Project (the "Consulting Agreement"). *Id.* ¶ 24. Clowers executed the Consulting Agreement on February 21, 2019. Dkt. 38-2 at 15. The Consulting Agreement provided that Clowers would work as an independent contractor, and that either party could terminate the contract with 30 days' written notice. *Id.* §§ 4, 12. HCI alleges that Clowers also entered into a confidentiality agreement, a non-solicitation agreement, and an agreement to refrain from conflicts of interest, such as working for a direct competitor, while working for HCI. 38 ¶¶ 26-28.

In the fall of 2020, as the Seattle Project was coming to an end, HCI began negotiating with a new potential client, Wellforce Inc., a healthcare provider in Boston, Massachusetts. Based on HCI's experience with Clowers on the Seattle Project, HCI asked Clowers to help HCI "pitch and close the Wellforce Project," and Clowers agreed. *Id.* ¶ 35. HCI alleges that on November 9, 2020, Clowers traveled to Boston to give a pitch to Wellforce on HCI's behalf. *Id.* ¶ 38.

On December 10, 2020, HCI sent Clowers a letter offering her the position of Vice President-Consulting Engagement, in which she would be "primarily responsible for developing, implementing, and overseeing the Wellforce Project as the Program Director." *Id.* ¶ 43. HCI alleges that Clowers executed the new employment agreement on December 17, 2020, with a start

2

date of December 21, 2020. The agreement stated that Clowers' job with HCI was at will and could be terminated by either party "at any time, with or without notice." Dkt. 29-5 at 2.

The day before Clowers was to start her new job, she informed HCI that she was terminating her employment, effective immediately. Dkt. 38 ¶ 47. HCI alleges that during the fall of 2020, when Clowers was supposed to be helping HCI land the Wellforce Project, she was working as a "double agent" for one of HCI's direct competitors, Evergreen Healthcare Partners, Inc. ("Evergreen"). *Id.* ¶ 59. HCI contends that Evergreen's Chief Executive Officer, Drew Madden, "began a text message campaign" in November 2020 to "induce" Clowers to work for Evergreen and "breach her contractual and fiduciary duties to HCI." *Id.* ¶¶ 52, 56. HCI alleges that Evergreen recruited Clowers to work for Evergreen to procure the Wellforce Project. HCI alleges that "Madden and Evergreen knew Clowers and C&S had intimate knowledge of the Wellforce Data and sought to use that data for their benefit, and to HCI's determent." *Id.* ¶ 61. HCI further alleges that "Madden and Evergreen knew that submitting Clowers as an Evergreen representative for the Wellforce Project, when she was already submitted to the Wellforce Project as an HCI representative would cause confusion with Wellforce." *Id.* ¶ 65.

Clowers began working for Evergreen on December 19, 2021. *Id.* ¶ 73. Shortly thereafter, Wellforce awarded the project to Evergreen, and Clowers became the Project Director for the Wellforce Project. *Id.* ¶ 74.

On March 9, 2020, HCI filed this suit against Clowers and C&S, alleging breach of contract, breach of fiduciary duty, and tortious interference with prospective contracts and business relationships. Dkt. 1. On August 12, 2021, HCI filed an Amended Complaint, adding Madden and Evergreen as defendants and asserting claims of tortious interference with existing contract and tortious interference with prospective contracts and business relations against them. Dkt. 38. HCI

also added a civil conspiracy claim against all Defendants. HCI seeks lost profits associated with the Wellforce Project, exemplary and punitive damages, costs, and attorneys' fees.

Defendants moved to dismiss HCI's claims for lack of jurisdiction and failure to state a claim. On March 14, 2022, the undersigned Magistrate Judge recommended that the District Court (1) dismiss Defendants Evergreen and Madden for lack of personal jurisdiction; (2) dismiss HCI's breach of fiduciary duty and civil conspiracy claims; and (3) deny the motion to dismiss as to HCI's breach of contract and tortious interference with prospective contracts and business relations claims. Dkt. 68. On July 24, 2022, the District Court adopted the Report and Recommendation in full. Accordingly, Evergreen and Madden are no longer parties, and HCI's claims against Clowers and C&S for breach of contract and tortious interference with prospective contracts and business relations are the only claims remaining.

Defendants Clowers and C&S now move to exclude HCI's damages expert under Federal Rule of Evidence 702.

## II. Legal Standard

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993), the Supreme Court held that trial judges must ensure that scientific testimony or evidence is not only relevant, but also reliable. Rule 702 of the Federal Rules of Evidence was later amended to provide that a witness

> qualified as an expert . . . may testify . . . in the form of an opinion . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting FED. R. EVID. 702). The Rule 702 and *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

Under *Daubert*, expert testimony is admissible only if the proponent demonstrates that (1) the expert is qualified; (2) the evidence is relevant; and (3) the evidence is reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). The overarching focus of a *Daubert* inquiry is the "scientific validity and thus evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Watkins*, 121 F.3d at 989 (quoting *Daubert*, 509 U.S. at 594-95). The proponent of expert testimony bears the burden of establishing the reliability of the testimony. *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

Trial courts ordinarily apply four factors when considering the reliability of scientific evidence: (1) whether the technique can be or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique. *Id.* This test of reliability is flexible, and these factors "neither necessarily nor exclusively apply to all experts or in every case." *Kumho Tire*, 526 U.S. at 141. When conducting a *Daubert* analysis, the trial court's main focus should be on determining whether the expert's opinion will assist the trier of fact. *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019). Assisting the trier of fact means "the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument." *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992).

The court's role under Rule 702 "is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role—the court's role is limited to ensuring that the evidence in

5

dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration." *Puga*, 922 F.3d at 294. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### III. Analysis

HCI has designated Rob Sly as its damages expert to provide opinions and testimony regarding the lost profits HCI allegedly suffered as result of not being assigned the Wellforce Project. Sly issued his "Value of Economic Damages Due to the Loss of the Wellforce Project" expert report on September 30, 2022. Dkt. 71-1 at 7-43. Defendants argue that the Court should exclude Sly's expert testimony under Rule 702 because (1) his testimony is not based on sufficient facts or data; (2) his Report does not use reliable principles and methods; and (3) his Report does not reliably apply his methods and principles to the facts. The Court's analysis begins and ends with Sly's first argument.

#### A. Expert Report

Sly, the director of valuations and litigation support for Business Valuation, Inc., specializes in business valuations, financial analysis, financial forecasting, and complex financial modeling. Dkt. 71-1 at 45. He received a Bachelor of Arts degree in Communications in 1997 and a Master of Business Administration in 2001 from Brigham Young University. Sly also is an accredited senior appraiser. *Id.*

Based on information he received from HCI and the allegations in HCI's Amended Complaint, Sly opines in his Report that "it is a reasonable economic probability that the Plaintiff's total damages related to the lost Wellforce Project are $19,340,000." *Id.* at 19. To calculate these damages, Sly alleges that he used a lost profit analysis, which "measures the present value of the difference between the profits HCI would have attained, but for the alleged action of the

6

Defendants, and the profits actually attained." *Id.* Sly further explains that he used the following "facts, assumptions and calculations" to calculate the value of the damages: (1) the measurement date of September 30, 2022, based on HCI's allegations; (2) an 18-month damages period "[b]ased upon data provided by HCI representatives"; (3) that "HCI would have received a fixed fee from Wellforce for each consultant placed on the Wellforce Project, but for the actions of the Defendants"; (4) a summary of the number of consultants HCI would have placed on the Wellforce Project per month, the monthly billing rate per consultant, and the total projected billings per month, based on HCI's allegations; (5) schedules of pay rate expenses based on HCI's allegations; and (6) the present value of the monthly lost profits based on a prejudgment interest rate of 5% per annum. *Id.* at 19-23.

Sly also provided opinions as to HCI's damages related to the loss of the program director, program manager, program analysist, principal trainer, credentialed trainer, and "At-The-Elbow Go Live Support Consultant" positions. *Id.* at 25-40. Sly explained that these damages calculations were based on information he received from HCI and HCI's allegations in its First Amended Complaint. *Id.*

### B. Reliability and Sufficiency of Facts or Data

Defendants argue that Sly's Report should be excluded because he failed to rely on sufficient facts or data. Defendants contend that Sly relied solely on HCI's own financial projections to calculate his estimated lost profits and failed to conduct any independent research to determine whether HCI's projections were accurate. HCI does not respond to this argument in substance. Instead, HCI focuses on the allegations in its First Amended Complaint, contends that Sly is qualified, and argues that Defendants' argument involves matters that will be determined by the jury.

Under Rule 702, a qualified expert may testify in the form of an opinion if the testimony is based on sufficient facts or data and is the product of reliable principles and methods. Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert* at 592-93. The reliability inquiry extends "to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted). Expert evidence that is not "reliable at each and every step" is not admissible. *Id.*

Although the basis of an expert's opinion usually goes to the weight and not the admissibility of expert testimony, in some cases "the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion." *Viterbo*, 826 F.2d at 422; *accord Fair v. Allen*, 669 F.3d 601, 607 (5th Cir. 2012).

> Expert opinion testimony falls into this category when that testimony would not actually assist the jury in arriving at an intelligent and sound verdict. If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible under FED. R. EVID. 403.

*Viterbo*, 826 F.2d at 422 (internal citations omitted). While an expert "might be able to rely on the estimates of others in constructing a hypothetical reality," in order to do so "the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 348 (5th Cir. 2020) (per curiam) (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012)).

In *Jacked Up*, the Fifth Circuit excluded an expert report on lost profits where the expert assumed the accuracy of a set of projections of future sales without any independent determination that those projections were reliable. 807 F. App'x at 349. In support of its claim for lost profits,

the plaintiff (an energy drink developer) relied on its expert's report, which estimated its lost profits. The Fifth Circuit affirmed the district court's exclusion of the report because it was not based on sufficient facts or data. *Id.* at 346. Specifically, the Fifth Circuit found that the expert had "assumed the accuracy of a set of projections prepared by Sara Lee regarding future sales of Jacked Up products, which were set out in a document called the Sara Lee Pro Forma" and failed to make an "independent determination" whether those financial projections were valid or reasonable: "The [Expert] Report does not contain a word regarding the reliability of the Sara Lee Pro Forma or its preparation. Instead, [the Expert] seems to have assumed that the projections in the Sara Lee Pro Forma were correct and then extrapolated lost-profits figures." *Id.* at 346, 349.

Similarly, in *Diabetes Ctrs. of Am., Inc. v. Healthpia Am., Inc.*, No. H-06-3457, 2008 WL 375505, at *2 (S.D. Tex. Feb. 11, 2008), the district court excluded an expert's opinion on lost profits as speculative and unreliable where the expert "simply accepted [the plaintiff's] projection that their number of patients would increase from 7,000 in 2006 to 284,000 in 2007." "The Federal Rules of Evidence and the requirements of *Daubert* are not satisfied where, as here, the expert fails to show any basis for believing someone else's projections." *Id.*

Like the experts in the foregoing cases, Sly simply assumed the accuracy of the information and financial projections HCI provided him to prepare his report and did not independently determine whether that information was accurate or reliable. As Sly repeatedly states in his Report, all of the "facts" and "assumptions" he relied on to calculate lost profits were provided to him by HCI. Dkt. 71-1 at 19. The 18-month damages period, the assumption that HCI would have received a fixed fee from Wellforce for each consultant placed on the Wellforce Project, the number of consultants HCI would have placed on the Wellforce Project, and the schedules of pay rate

expenses all are based on information HCI provided to Sly and HCI's allegations. *Id.* at 19, 25, 28, 31, 34, 37, 40.

Sly testified at deposition that HCI gave him the "financial projections regarding the Wellforce contract." *Id.* at 122 (Sly Tr., 39:15-18). Sly also admitted repeatedly that he did not independently verify the information and financial projections HCI gave him to prepare his Report. While Defendants point out that Sly reviewed the Seattle Children's Hospital files and talked to HCI employee Patrick Henson, Sly testified that he did not verify any of the data or facts HCI provided to him:

> Q. Do you believe it's part of your duties as an expert to independently verify whether the numbers listed in your client's financial projection are reliable?
>
> A. My -- my analysis is based on the assumptions provided by the client; I assume they're reliable.
>
> Q. So you don't independently verify the information contained within your client's financial projection; is that correct?
>
> A. I did not independently verify each -- each of the -- each of the -- all data that -- that was provided by the client in this case.
>
> Q. Okay. You didn't independently verify any of the data that was provided by the client in this case, correct?
>
> A. We relied upon the data that was provided by the client as accurate.
>
> Q. And you did not independently verify the data as correct, right?
>
> A. No, we didn't verify all of the data.
>
> ***
>
> Q. So, again, my question was: Did you independently verify any of the data contained within HCI's financial projections as it pertains to the Wellforce project?
>
> A. We assumed the data was reliable.

*Id.* at 124 (41:5-23), 125 (42:12-16). Sly also testified that he did not perform "any independent research outside of the documents that were provided to [him] by HCI," other than "to determine what the appropriate interest rate should be" and "a general overview of what HCI does." *Id.* at 99 (16:11-19).

Considering the record and arguments presented, the Court concludes that Sly's Expert Report is not based on sufficient data or facts and is unreliable because he failed to conduct any independent research to determine whether HCI's financial projections were accurate or reliable. *See Jacked Up*, 807 F. App'x at 348; *Diabetes Ctrs. of Am.*, 2008 WL 375505, at *2; *see also ZF Meritor*, 696 F.3d at 293 (affirming exclusion of a lost-profits expert where expert's opinion was based on internal financial projections of "a nascent company, the assumptions underlying which were relatively unknown" to the expert); *JRL Enters., Inc. v. Procorp Assocs., Inc.*, 2003 WL 21284020, *7 (E.D. La. June 3, 2003) (excluding testimony on lost profits where proffered expert failed to conduct any independent research to determine whether projections provided by plaintiff were accurate or reliable). Accordingly, Sly's testimony must be excluded under Rule 702.

## IV. Conclusion

For the foregoing reasons, Defendants' Opposed Motion to Exclude Plaintiff's Expert Rob Sly under Federal Rule of Civil Procedure 702 (Dkt. 71) is **GRANTED**.

It is **FURTHER ORDERED** that the Clerk **REMOVE** this case from the Magistrate Court's docket and **RETURN** it to the docket of the Honorable Robert Pitman.

**SIGNED** on August 2, 2022.

                                                                    _____
                                                                    SUSAN HIGHTOWER
                                                                    UNITED STATES MAGISTRATE JUDGE